IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MELISSA M., [1]

              Plaintiff,

vs.

                        No. 18-cv-1130-JPG-DGW

NANCY A. BERRYHILL, Acting Commissioner
of Social Security,

              Defendant.

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Melissa M. seeks judicial review pursuant to 42 U.S.C. § 423 *et seq.* of the final agency decision denying her application for Disability Insurance Benefits (DIB) and a Period of Disability.

## Procedural History

The plaintiff applied for benefits in August 2015 alleging disability beginning on April 13, 2014. After holding an evidentiary hearing by video, Administrative Law Judge (ALJ) Raymond L. Souza denied the plaintiff's application on November 15, 2017. (Tr. 12-31.) The Appeals Council denied review on March 19, 2018, and the decision of the ALJ became the final agency decision subject to judicial review. (Tr. 1-6.). The plaintiff has exhausted her administrative remedies and filed a timely complaint with the Court.

## Issue Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ has a duty to determine whether a clamant meets or equals a listed impairment. The issue is whether the ALJ met that duty when he failed to acknowledge [plaintiff's] argument at hearing that her migraines equaled Listing 11.02.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order to protect her privacy. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

## Applicable Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must result from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. Part 404, Subpart P, App'x 1; *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). An impairment is "medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations— failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant

is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id*.; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### The Decision of the ALJ

ALJ Souza followed the five-step analytical framework described above:

Step 1: The ALJ determined that plaintiff had not worked since the alleged onset date of April 13, 2014.

Step 2: The ALJ found that plaintiff had severe impairments of post-traumatic stress disorder, depression, anxiety, migraine headaches, and arthritis.

Step 3: The ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed

impairments. Specifically, he analyzed whether plaintiff's impairments met or equaled Listing 12.04 (Depressive, bipolar and related disorders) and 12.06 (Anxiety and obsessive-compulsive disorders); he did not mention or discuss Listing 11.02 (Epilepsy).

Step 4: The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level with some physical and mental limitations and that, with those restrictions, she was unable to perform her past relevant work as a cook or security guard.

Step 5: The ALJ found, based upon plaintiff's age, education, work experience, and RFC, as well as the testimony of a vocational expert (VE), that plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. Consequently, the ALJ concluded that plaintiff was not disabled.

Plaintiff faults the ALJ for failing to mention or analyze at Step 3 whether she meets or exceeds Listing 11.02.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff and is confined to the relevant time period. As plaintiff addresses only whether her migraine headaches equal Listing 11.02 at the third step of the five-step inquiry, a discussion of the evidence related to her other impairments is unnecessary.

### 1. Agency Forms

Plaintiff was born in 1974 and was 39 years old on the alleged onset date of April 13, 2014. She was last insured for disability benefits on September 30, 2018. (Tr. 187). She has worked

before as a cook, dietary manager and security guard. (Tr. 190). In September 2015, she submitted a report claiming she was limited in her ability to work because she has problems standing for long times, suffers from post-traumatic stress disorder and major depression, has a hard time dealing with or being around people and crowds, suffers from migraine headaches. (Tr. 217, 224.) She stated that most of the time between waking and going to bed she just watches television. She has trouble going to or staying asleep. With the help of her husband and son, she cares for her son to make sure he gets ready for school and feeds the pets. She has no problems caring for herself. although she needs an alarm to remind her to take her medication. She prepares a simple meal once a day, is able to "normal things" as far as household chores but it takes longer than usual, is able to drive or ride in a car, go outside alone, shop for food, pay bills, count change and write checks. (Tr. 218-221.)

In February 2016, plaintiff's husband reported that she had a hard time getting out of bed due to migraines. He said that she gets their son ready for school but is so worn out she has to lay back down, and then he gets for her her medications, lunch, and anything she needs. He stated that, with his and their son's help, she feeds the cat and dog and changes the litter box. He has to cook for her so she will eat and has to remind her to shower and take her medication. He said she is able to prepare simple meals but that it takes hours. He reported that she mows the lawn, cleans and does laundry except when she is unable because of headaches. He also said she can drive and ride in a car, go out alone, shop, pay bills with help, count change, handle a savings account with help, and use a checkbook. (Tr. 240-47.)

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in August 2017. (Tr. 33-34.)

Plaintiff testified that she lived with her husband and her son with special needs. She has an associate degree. (Tr. 35-36.)

Plaintiff testified that she has migraines five to six times a month, each lasting several days. When she has a migraine, she cannot stand noise or light and has to lock herself in a room. It they get too bad, she has to go to the hospital for medication to stop them. When she receives Botox injections, they knock the intensity of the migraine down a day or two so she can try to function, but she is not always able to. Other medications she has tried for migraines have not worked for her. When she has migraines, her husband cares for their special needs son. (Tr. 38-40.)

At the hearing, plaintiff's counsel suggested that plaintiff's migraines satisfied Listing 11.02B and D regarding dyscognitive seizures.[2]

### 3.  Medical Records

Medical records show plaintiff has suffered from migraines since at least 2010. A CT scan done on August 23, 2010, was unremarkable. (Tr. 298.)

Just prior to the alleged onset date, plaintiff began seeing Dr. Muddasani Reddy, a neurologist. On January 23, 2014, Dr. Reddy saw plaintiff and ordered two MRIs and an EEG. (Tr. 369, 837-38.) Dr. Reddy prescribed Amitriptyline and Tylenol 3 for plaintiff's headaches. (Tr. 372.) An EEG performed on February 3, 2014, revealed no significant abnormalities. (Tr. 847). An MRI of plaintiff's brain on February 4, 2014, was abnormal. It revealed scattered foci of FLAIR signal abnormality in the supratentorial deep white matter that were non-specific, but greater than expected for plaintiff's age. This may represent advanced small vessel ischemic disease, stigmata of migraines, post traumatic gliosis or demyelinating lesions among others. (Tr. 841.) An MRI of plaintiff's cervical spine done the same day showed very mild bilateral foraminal

---

[2] Counsel actually pointed to Listing 1.02, not 11.02, but it is clear from the context he was pointing to the listing for epilepsy, Listing 11.02.

narrowing at C5-6 secondary to uncovertebral hypertrophy but was otherwise essentially normal for plaintiff's age with no acute abnormalities. (Tr. 844.) Plaintiff also saw Dr. Reddy on February 20, 2014, for a follow-up visit. (Tr. 369.)

2014 Post-Onset

On July 10, 2014, plaintiff visited the emergency department at St. Elizabeth's Hospital for a severe headache with sensitivity to light and sound that had lasted three to four days. She reported "lesions on her brain," an apparent reference to the February 4, 2014, MRI. She was given Toradol, Dilaudid, and Zofran. and was sent home in an improved and stable condition. (Tr. 395-400).

Plaintiff saw Dr. Reddy on July 14, 2014 for chronic headache, (Tr. 369.)

On August 15, 2014, plaintiff visited the emergency room at Memorial Hospital for a headache with nausea and light sensitivity. The headache had begun the day before and did not improve with Ibuprofen and Excedrin. She was given Toradol and Morphine, and her headache improved. She was also given Zofran. (Tr. 548-56.)

On September 4, 2014, plaintiff visited the emergency department at St. Elizabeth's Hospital for a severe headache with light sensitivity, nausea, lightheadedness, dizziness and blurred vision. She stated the headache had begun the day before and did not improve after she took Ibuprofen and Tramadol. A CT scan of her brain was normal. She was given Ondansetron HCl, Ketorolac Tromethamine, Benadryl, Norco, and Fentanyl and was sent home in an improved and stable condition. (Tr. 405-10.)

Plaintiff saw Dr. Reddy on September 8, 2014, for a severe headache. Dr. Reddy noted she suffered severe headaches three to four times a year lasting up to a week. He added increased her dosage of Amitriptyline and added Inderal to her medications. (Tr. 368.)

On September 12, 2014, plaintiff visited Terrance Craion, M.D., her primary care physician, who prescribed Imitrex for plaintiff's migraines and referred her to a different neurologist. (Tr. 671-73).

On October 2, 2014, plaintiff visited the emergency department at St. Joseph Hospital for a "headache from hell" that began two days earlier and became worse. She self-treated with her husband's Percocet but felt no relief. She was given Dilaudid, Benadryl, and Zofran. and was sent home in stable condition. (Tr. 359-62.)

Plaintiff saw Dr. Reddy on October 20, 2014 for migraines. (Tr. 367.)

<u>2015</u>

On March 3, 2015, plaintiff visited Dr. Craion for migraines, unspecified, without mention of intractable migraine or status migrainosus, and other ailments. Dr. Craion prescribed Topomax and referred her to a neurologist. (Tr. 649-51.)

On April 30, 2015, plaintiff visited Gia Patel, M.D. at Dr. Craion's office for a migraine, unspecified, without mention of intractable migraine or status migrainosus, that had begun four days earlier and that was not helped by Ibuprofen or Tylenol. She reported that she had had three migraines since January 2015. She reported Imitrex, Amitriptyline and Toradol did not help but that Dilaudid and Morphine have helped. She was given Toradol and prescribed Propranolol. (Tr. 644-46.)

On June 30, 2015, plaintiff visited Marjorie Guthrie, M.D., plaintiff's primary care physician, for migraines, unspecified, without mention of intractable migraine or status migrainosus, and other ailments. Dr. Guthrie reported that plaintiff was stable on medications and had no concerns at the time. She prescribed Imitrex for headaches. (Tr. 636-39.)

On August 6, 2015, plaintiff visited the emergency room at Memorial Hospital for a

migraine headache with light sensitivity, blurred vision, and nausea. The headache had lasted four days. She was given Benadryl, Dilaudid, Toradol, and Reglan, and her headache resolved while she was at the hospital. She was sent home in stable condition. (Tr. 574-81.)

On August 18, 2015, plaintiff saw Alex Labounty, D.O., for migraines, unspecified, without mention of intractable migraine or status migrainosus, that had occurred off and on for two weeks. She reported she was no longer taking NSAIDS (non-steroidal anti-inflammatory medications) or over-the-counter medications. She was given Toradol, Zofran and Benadryl. (Tr. 633-36.)

On September 1, 2015, plaintiff visited the emergency department at St. Elizabeth's Hospital for a headache and knee pain after falling and hitting her head on concrete. She described the pain as mild in intensity. A CT scan of her head was normal. She was given sodium chloride and was sent home in stable condition. (Tr. 411-17, 421.)

On September 3, 2015, plaintiff visited the emergency room at Memorial Hospital for a severe headache with light sensitivity, sound sensitivity and nausea. The headache had lasted four to five days and was not relieved by the medications provided by St. Elizabeth's Hospital several days earlier. She was given Benadryl, Toradol, and Reglan. She was sent home in good condition with a prescription for Oxycodone. (Tr. 582-89.)

On September 14, 2015, plaintiff saw Dr. Guthrie for moderately severe migraines, unspecified, without mention of intractable migraine or status migrainosus. She described gradual onset of intermittent episodes that involved tearing/watery eyes and normal feeling/sensation but did not involve vomiting, sensitivity to light, confusion, slurred speech, preceding aura, double vision, motor paralysis, dizziness, sleep disturbances, nosebleeds, hoarseness, sore throat or hearing loss. She reported she had received no relief from medications. Dr. Guthrie prescribed

Amitriptyline and Maxalt.  (Tr. 631-33.)

On September 25, 2015, plaintiff reported to Michael X. Liu, M.D., a neurologist, that she had had headaches for over five years, that they had been getting worse over time, and that medication did not help.  She reported she got headaches more than five days out of one week and had visited the emergency room for headaches four to five times in the prior six months.  Dr. Liu reviewed the MRIs and EEG ordered in February 2014 by Dr. Reddy.  (Tr. 808-13.)

On October 13, 2015, Dr. Guthrie saw plaintiff for moderately intense migraine headaches, not intractable, without status migrainosus.  Plaintiff reported she was doing a little better, had seen a migraine specialist who had increased her Elavil dosage and added Triptan.  (Tr. 1169.)

On November 20, 2015, Stacy Jefferson, M.D., at Dr. Guthrie's office, saw plaintiff for headaches.  Dr. Jefferson recommended a Toradol injection, but plaintiff declined, saying it did not work.  (Tr. 1166.)

Plaintiff saw Dr. Liu again on December 18, 2015, for chronic migraine without aura, not intractable, without status migrainosus.  Plaintiff reported that since her last visit to Dr. Liu, she had had a headache at least five days out of one week, sometimes for the whole week.  She rated the headache pain level as eight out of ten, stated they came with nausea and light sensitivity, and stated she could not function because of the headaches.  (Tr. 814-19.)

2016

On January 11, 2016, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a headache, "the worse one [she] ever had," with nausea, photophobia, and blurred vision, but she did not show signs of distress in the exam room.  She reported that the headache started two days earlier and was severe in intensity.  A CT scan of her head showed no acute intracranial process.  She was given Zofran, Toradol, Benadryl and Fentanyl.  She was sent home

in improved and stable condition.  (Tr. 930-36.)

On January 26, 2016, Dr. Liu treated plaintiff's migraines with a Botox injection.  (Tr. 1203.)

On March 2, 2016, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a moderate headache with photophobia and blurred vision.  She reported that the headache started two days earlier.  She was given Fentanyl and was sent home in stable condition. (Tr. 906-10.)

On March 25, 2016, Dr. Liu talked with plaintiff about Botox injections to treat her migraines.  She reported that the January 26, 2016, Botox injection helped her headache a lot and that her headache decreased about 75%.  It started to come back along with blurry vision the week before, so she went to the emergency room.  (Tr. 1200.)

On April 20, 2016, Dr. Guthrie saw plaintiff for severe headaches.  Plaintiff reported Botox from the neurologist was helping.  (Tr. 1145-46.)

On April 21, 2016, Dr. Liu treated plaintiff's migraines with a Botox injection.  (Tr. 1197).

On May 13, 2016, plaintiff visited the emergency room at Memorial Hospital because of a headache with photophobia and phonophobia.  The headache had begun three days before.  She was given Apresoline, Dilaudid, Toradol, Reglan and Zofran, and her headache improved.  She was sent home in stable condition (Tr. 1077-80.)

On May 20, 2016, plaintiff visited the emergency room at Memorial Hospital because of a moderate headache with blurry vision and loss of appetite.  The headache had begun the day before, had gradually worsened.  She was given Benadryl, Dilaudid, Toradol and Reglan, and she was sent home in stable condition (Tr. 1073-76.)

On June 11, 2016, plaintiff visited the emergency room at Memorial Hospital because of a

headache with photophobia and phonophobia. The headache had begun days earlier. She was given Benadryl, Fentanyl, Toradol and Reglan, and she felt better in the hospital. (Tr. 1067-72.)

On June 21, 2016, Dr. Liu treated plaintiff's migraines with a left occipital nerve block. Plaintiff reported her headache was much better after the April 21, 2016, Botox injection but that it started to come back. She reported that she had had three headaches the month before, each lasting for one to two days. (Tr. 1193-94.)

On July 9, 2016, plaintiff visited the emergency room at Memorial Hospital because of a headache with nausea and vomiting. The headache had begun five days earlier and did not get better after she took Aleve. She was given Benadryl, Dilaudid, Toradol and Reglan, and her headache improved in the hospital. She was sent home in stable condition. (Tr. 1053-59.)

On July 14, 2016, Dr. Guthrie saw plaintiff, who reported Botox was helping. (Tr. 1134.)

On August 5, 2016, Dr. Liu treated plaintiff's migraines with a Botox injection. (Tr. 1190.)

On September 2, 2016, plaintiff visited the emergency room at Memorial Hospital because of a severe headache with nausea, photophobia, and blurry vision. The headache had begun four days earlier. She was given Benadryl, Haldol, and Toradol and felt much better. She was sent home in improved condition. (Tr. 1033-37.)

On September 5, 2016, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a severe headache with photophobia and blurred vision. She reported that the headache started two to four days earlier and that she got no relief from medication. A CT scan of her head showed no acute intracranial abnormalities. She was given Toradol, Compazine, Benadryl, Fentanyl, and Norco. She was sent home in improved and stable condition. with a prescription for Fioricet for breakthrough pain (Tr. 882-86.)

On October 6, 2016, plaintiff visited the emergency room at Memorial Hospital because of

a mild headache with nausea and vomiting. The headache had begun that day when she was moving hay bales in the heat. She was given fluids and Zofran and began feeling better. She was sent home in stable condition. (Tr. 1027-32.)

On November 25, 2016, plaintiff visited the emergency room at Memorial Hospital because of a headache with photophobia. The headache had begun two days earlier. She was given Benadryl, Haldol, Toradol, and Reglan, and her headache improved. She was sent home in stable condition. (Tr. 1022-26.)

On December 25, 2016, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a moderate headache that had started the night before. She was given Fentanyl, and Zofran. She was sent home in stable condition. (Tr. 874-78.)

2017

On January 24, 2017, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a moderate headache with nausea. She reported that the headache started a couple of days earlier. She was given Dihydroergotamine and Reglan and began feeling significantly better afterward. She was sent home in improved condition. (Tr. 860-66.)

On January 26, 2017, Dr. Guthrie saw plaintiff for severe headaches with nausea, photophobia and sleep disturbances. Plaintiff described the headaches as severe, requiring several emergency department visits a month. She reported that she had taken all preventive measures but continued to have more than fifteen headaches, half of which required emergency department visits. Dr. Guthrie agreed to resume Botox injections and prescribed Maxalt. (Tr. 1123-26.)

On February 27, 2017, Dr. Guthrie gave plaintiff a Botox injection for headaches. Plaintiff described the headaches as severe, requiring several emergency department visits a month. (Tr. 1117-20.)

On February 28, 2017, plaintiff visited the emergency room at Memorial Hospital because of a severe headache with photophobia and nausea. The headache had been intermittent for one week. She was given sodium chloride and was sent home in stable condition. (Tr. 1015-21.)

On March 20, 2017, plaintiff visited the emergency room at Memorial Hospital because of a severe headache that had begun that day. She was given Benadryl, Dilaudid, Toradol, and Reglan and was sent home in stable condition. (Tr. 1008-12.)

On March 22, 2017, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a moderate headache with blurred vision, nausea and photophobia. She reported that the headache started about five days earlier. She was given Dihydroergotamine, Reglan and Ativan and was sent home in improved condition. (Tr. 851-56.)

On March 30, 2017, Dr. Guthrie saw plaintiff for headaches with nausea, photophobia and sleep disturbances. Plaintiff described the headaches as severe, requiring several emergency department visits a month. She reported that a significant decrease in her headache severity and a decrease in number from fifteen debilitating headaches a month to two or three. She continues to have headaches, but they are much more manageable. She was to continue with Botox injections. (Tr. 1114-17.)

On May 25, 2017, plaintiff visited the emergency room at Memorial Hospital because of a moderate headache with nausea and photophobia. She reported that the headache had lasted a week. She was given Reglan, Benadryl and Dilaudid, and her headache improved at the hospital. (Tr. 1004-07.)

On May 30, 2017, plaintiff visited the emergency room at Memorial Hospital because of a moderate headache with nausea and photophobia. She reported that the headache started a couple of days earlier. She was given Reglan, Benadryl, and Morphine Sulfate and was sent home in

improved and stable condition. (Tr. 999-1003.)

On June 30, 2017, plaintiff visited the emergency room at Memorial Hospital because of a headache with sensitivity to light and sound. She reported that the headache had started the day before and had worsened that day. She was given Fioricet, Benadryl, and Reglan and was sent home in stable condition. (Tr. 1212-17.)

On July 12, 2017, plaintiff visited the emergency department at St. Elizabeth's Hospital because of a headache photophobia and nausea/vomiting. She reported that the headache started about three days earlier, and her condition had temporarily improved after treatment in the emergency room. A CT scan revealed no acute intracerebral process. She was given, Dihydroergotamine, Reglan, Ativan and Norco and reported she was feeling somewhat better. She was sent home in stable condition. (Tr. 1228-38.)

Throughout the time period covered by the aforementioned medical history, plaintiff had various visits to medical providers for various other ailments where the medical records do not indicate she complained of headaches.

Plaintiff has provided no conclusion from an acceptable medical source that her impairments medically equal a listed impairment.

### 4. State Agency Consultants

No state agency consultant opined that plaintiff's migraines met or equaled a listed impairment.

In October 2015, state agency reviewing physician Patricia Chaplin, M.D., reviewed plaintiff's medical records, including evidence of her migraines, and did not conclude that her impairments met or exceeded any listing. (Tr. 57-58, 62.)

On April 4, 2016, plaintiff described her activities to Harry J. Deppe, Ph.D., a state

consulting clinical psychologist, as doing a little cleaning, watching TV, spending time on the computer, cooking, occasionally cleaning the house, shopping, paying bills. She appeared to be able to bathe and dress herself and to have a fair ability to complete tasks in a timely and efficient fashion. Dr. Deppe noted plaintiff suffered from migraines but did not find plaintiff satisfied any listing. (Tr. 827-30.)

On April 7, 2016, plaintiff reported to Vittal V. Chapa, M.D., S.C., a state consulting internal medicine specialist, that her headaches had significantly improved since she started getting Botox injections. Dr. Chapa did not find plaintiff satisfied any listing. (Tr. 832-34.)

On April 12, 2016, state agency non-examining consultant Joseph Cools, Ph.D., reviewed plaintiff's medical records. Also in April 2016, after plaintiff saw Dr. Deppe and Dr. Chapa, state agency reviewing physician Bernard Stevens, M.D., reviewed plaintiff's medical records. Neither concluded that plaintiff's impairments met or exceeded any listing. (Tr. 77-80, 82-84, 88).

## Analysis

Plaintiff complains that ALJ Souza did not mention Listing 11.02, the listing for epilepsy, which is routinely applied when a claimant has migraines because there is no separate listing for migraines or headaches. *See Cooper v. Berryhill*, 244 F. Supp. 3d 824, 829 (S.D. Ind. 2017). To satisfy a listing, a claimant may show migraine headaches cause functional impairments equivalent to those described in Listing 11.02. *Id.* at 828-29. Listing 11.02 provided at the time of ALJ Souza's decision:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at

least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

C.     Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii)); or
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)); or

D.     Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:
1. Physical functioning (see 11.00G3a); or
2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
3. Interacting with others (see 11.00G3b(ii)); or
4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Part 404, Subpart P, App'x 1 pt. A2, § 11.02 (2017).  Thus, if a claimant has documented instances of migraine that satisfy either A, B, C, or D, she satisfies Listing 11.02 and will be found disabled at Step 3.

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett v. Barnhart,* 381 F.3d 664, 668 (7th Cir.2004); *accord Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).  However, the failure to specifically mention a listing by name does not necessarily require remand if the ALJ gave more than a perfunctory analysis of the impairment, did not ignore evidence favorable to the plaintiff, and properly applied the law to the facts.  *See Jolivette v. Astrue*, 332 F. App'x 326, 327 (7th Cir. 2009) ("It is not necessary to cite a regulation by number; the agency's obligation is to apply the law to the facts. . . ."); *Rice v. Barnhart*, 384

F.3d 363, 369 (7th Cir. 2004) (rejecting argument "that the ALJ's failure to explicitly refer to the relevant listing alone necessitates reversal and remand" where ALJ apparently considered and applied the listing); *compare Brindisi*, 315 F.3d at 786-87 (noting remand required where listing not named *and* perfunctory analysis).

Here, while the ALJ did not specifically refer to Listing 11.02 (epilepsy), he clearly gave more than a perfunctory analysis of plaintiff's headaches, their frequency and severity, and their impact on her life. He noted the lack of any conclusion by an acceptable medical source that plaintiff equaled any listed impairment. (Tr. 17) In connection with plaintiff's RFC, the ALJ discussed the intensity, persistence, and limiting effects of plaintiff's headaches and found that plaintiff's statements as to these factors were not entirely consistent with the medical evidence and other evidence in the file. Specifically, she reported to some health care providers that she had headaches five days a week with each headache lasting about three days, and she testified at the ALJ's hearing that she had five to six migraines per month with each headache lasting several days. However, the ALJ noted negative CT scans and a normal EEG revealing no objective evidence that could explain the abnormality in her 2014 MRI; frequent emergency room visits that were quickly resolved and did not result in any admissions for inpatient treatment; inconsistency between the severity she reported and objective symptoms of distress; plaintiff's reports of being stable on her medication and improvement with Botox injections yet seeking emergency room treatment more often during these improved periods; and inconsistency between the number of days plaintiff reported having migraines with her reported activities. (Tr. 20-21). Because ALJ Souza's decision, when read as a whole, shows that he gave adequate consideration to plaintiff's headaches, apparently concluding they did not meet Listing 11.02, the Court will not remand this case to the Commissioner simply because ALJ Souza did not specifically cite that listing.

ALJ Souza's conclusion that plaintiff does not meet Listing 11.02 is supported by substantial evidence. As a preliminary matter, the signatures of state agency physicians on the respective Disability Determination and Transmittal forms conclusively establish that they have considered the question of whether a listing has been satisfied; all state agency doctors in this case answered that it had not. SSR 96-6P, 1996 WL 374180, at *3 (July 2, 1996). "A finding of medical equivalence requires an expert's opinion on the issue," *Minnick v. Colvin*, 775 F.3d 929, 935, (7th Cir. 2015), but there is no medical opinion in the record to contradict the state agency physicians' conclusions. Consequently, the conclusions of the state agency physicians constitute substantial evidence to support the ALJ's decision that the plaintiff did not meet or exceed a listing.

Plaintiff further suggests that the ALJ ignored pertinent evidence that would support a finding that she equaled Listing 11.02 and that the Court must therefore remand this case. She points specifically to the abnormal February 2014 MRI, but the ALJ considered that MRI, the fact that the reasons for its abnormality were undetermined, and its significance in light of the plaintiff's other imaging tests and medical treatment for migraines. (Tr. 20.) Plaintiff has not, however, pointed to any evidence or medical source opinion the ALJ overlooked that supports her contentions that her migraines were as severe or as frequent as needed to demonstrate functional impairment equivalent to that described by Listing 11.02.

Even if the ALJ erred in his consideration of the evidence or in his explanation of his conclusion, any error would be harmless and would not justify a remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (remand not required where ALJ would reach same result when error is corrected). The claimant bears the burden of proving through record evidence that she has a functional impairment that meets all applicable criteria. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). In addition to the lack of an acceptable medical source's opinion that she

equaled a listing, which alone is fatal to her position, there is insufficient evidence for the ALJ to find the plaintiff meets or equals Listing 11.02, as explained below.

Plaintiff fails to point to evidence that she satisfies Listing 11.02(B) or (D) applicable to dyscognitive seizures. The regulations describe dyscognitive seizures:

> Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure (see 11.00H1a).

20 C.F.R. Part 404, Subpart P, App'x 1 pt. A2, § 11H1b (2017). No medical evidence in the record suggests plaintiff ever had a migraine during which she suffered an alteration of consciousness or that otherwise approached a dyscognitive seizure.

Even assuming her migraines could be considered the equivalent of a dyscognitive seizure, the record does not reflect the frequency of such instances as required by Listing 11.02(B)—once a week for three consecutive months—or (D)—once every two weeks for three months with marked limitation in one of five areas—despite adherence to prescribed treatment. As discussed above, the ALJ rejected plaintiff's description of the frequency of her migraines as inconsistent with other evidence in the record, including her contemporaneous statements to providers that her migraines were stable or improved with medication and other evidence that the migraines did not significantly impair her daily activities (yard work, farm work, operating a business, gym workouts, caring for disabled son, shopping, driving, household chores, self-care). The ALJ may disregard a claimant's testimony where it conflicts with what she told a provider, *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008), or may find it exaggerated where it is not consistent with her daily activities, *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016).

Even if it were assumed that plaintiff experienced a migraine equivalent to a dyscognitive

seizure every time she visited the emergency room, the record does not show an emergency room visit for a migraine once a week or once every two weeks for three consecutive months. Thus, there is substantial evidence supporting the conclusion that she did not meet listing 11.02(B) or (D).

Plaintiff also fails to show she satisfies Listing 11.02(A) or (C) applicable to tonic-clonic seizures. The regulations describe tonic-clonic seizures:

> Generalized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). Tongue biting and incontinence may occur during generalized tonic-clonic seizures, and injuries may result from falling."

20 C.F.R. Part 404, Subpart P, App'x 1 pt. A2, § 11H1a (2017). No evidence in the record suggests plaintiff ever had a migraine during which she lost consciousness or that otherwise approached the severity of a tonic-clonic seizure. Thus, there is substantial evidence supporting the conclusion that she did not meet listing 11.02(A) or (C).

For the foregoing reasons, the Court finds the ALJ's decision at Step 3 that plaintiff did not equal a listing is supported by substantial evidence and that any error was harmless.

## Conclusion

The Commissioner's final decision denying Melissa M.'s application for DIB and a Period of Disability is **AFFIRMED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of the Commissioner.

**IT IS SO ORDERED.**
**DATED: June 21, 2019**


         s/ J. Phil Gilbert
         **J. PHIL GILBERT**
         **DISTRICT JUDGE**